**UNITED STATES OF AMERICA,**
**Ex rel. Jay Gallo and Greg Quinn**

   **Plaintiffs,**

 v.

**Case No. 3:18-cv-811-J-32MCR**

**THOR GUARD, INC, a Florida Profit
Corporation; ROBERT DUGAN, an
individual; and PETER TOWNSEND, an
individual**

**TO BE FILED IN CAMERA
AND UNDER SEAL**

   **Defendants,**

## COMPLAINT FOR DAMAGES
## <u>UNDER THE FALSE CLAIMS ACT, 31 U.S.C.A. §§ 3729, ET SEQ.</u>

  1. Plaintiffs, by and through their attorneys, brings this lawsuit on behalf of the United

States of America pursuant to the False Claims Act, 31 U.S.C.A. §§ 3729, et seq. against

Defendants, Thor Guard, a Florida Profit Corporation ("Thor Guard"), Robert Dugan, an

individual ("Dugan") and Peter Townsend ("Townsend') (collectively, the "Defendants").

  2. This Complaint is filed in camera and under seal and may not be served upon the

Defendants until further order of this Court.

  3. This Complaint involves violations of the False Claims Act, 31 U.S.C.A. § 3729

by the Defendants.

### <u>INTRODUCTION AND SUMMARY OF THE CLAIM</u>

  4. Thor Guard sells products to various federal agencies by making false claims about

the products ("Faulty Products"). This fraudulent activity has occurred since at least 2010 and is

continuing, as is described in more detail below. The Faulty Products are sold through the General

Services Administration (GSA).

  5. Thor Guard falsely claims the Faulty Products can reasonably predict lightning

before it occurs, that Thor Guard matches the Federal government price to the lowest price

S-1

provided to other customers, that the Faulty Products comply with Federal government rules, requirements and regulations for selling products to the government and most importantly, that the Faulty Products successfully predict lightning with over 95% accuracy[1].

6.     Contrary to Thor Guard's false claims, since 2010, the Faulty Products rarely work, Thor Guard is charging the Federal government significantly more than other customers (sometimes almost double), the Faulty Products do not meet the minimum requirements to sell to the Federal government and the Faulty Products does not predict lightning with any reasonable success.

7.     For example, just this month, Thor Guard's internal professional meteorologist, using Vaisala's National Lightning Detection Network (NLDN), a lightning detection data relied upon by the Federal government, completed a random analysis of twenty-three (23) sites containing the Faulty Products for 2017, which demonstrated a success rate of approximately 17% to 19%, as compared to the advertised rate of over 95%. The average person can predict the danger of lightning with a higher success rate by simply looking into the sky for a few seconds.

8.     The Critical Success Index (CSI), an index used by the National Weather Service in determining the accuracy of Federal government issued weather forecasts of severe weather, was calculated for the twenty-three Faulty Products locations during 2017. The CSI ratio for the Thor Guard product analysis was determined to be 0.17 where a 0.00 indicates no prediction skill and a 1.00 indicates perfect prediction capability.

9.     This study can be expanded to additional years or additional products with similar results and findings of inaccuracy. This Faulty Products simply does not perform in the way it is advertised and sold to the Federal government.

---

[1] Thor Guard has even claimed the accuracy is above 97%.

10.     The Faulty Products are used and relied on at Federal government parks frequented and used by children and military families, is used by the Navy, Marine, National Guard and at USAF air bases to regulate when expensive government owned airplanes can and cannot be flown, refueled and/or disarmed, among other reasons. The Faulty Products are used by NASA, the FBI, Air Force, Lockheed, Department of the Treasury, US Marines, US Navy, US Army, and National Guard. Thor Guard advertises on its website that its systems are used in a wide variety of government applications, including security, technology, transportation, defense, explosives, nuclear energy and research. As it stands today, the Faulty Products put the lives of American service members and their families at risk.

11.     The Faulty Products are also used by large government contractors, including, but not limited to General Dynamics, Lockheed Martin, Jacobs Technology, Gulfstream Aerospace, among others.

12.     This Faulty Products are used by private companies around the world, who rely on it to warn employees and guests of safety issues, is relied on by factories and companies to regulate hours of operation and is relied on by schools, parks, and golf courses, among others. Thor Guard advertises on its website that its Faulty Products are used at golf courses, parks, schools and universities, cities and municipalities, air travel, government agencies, emergency management, mining and industrial, sporting events, broadcast and media.

13.     The Federal government and private companies rely on the Faulty Products for their life safety. A true and correct copy of a sample client list is attached as **Exhibit A.**

14.     The Faulty Products' failures likely result in a cost to our country of hundreds of millions of dollars and risk the lives of citizens, including military citizens and federal employees, every single minute of every single day. Without further action, lives will be lost, if they have not

already.

15.     All the while, Thor Guard is significantly overcharging the Federal government for the Faulty Products and is collecting millions of dollars of revenue for its shareholders. Thor Guard offers up to a 50% discount, but only gives the Federal government around a 12% discount, meaning Thor Guard is overcharging the Federal Government by up to 38%.

16.     The discount to the Federal government was previously even lower than 12%[2].

17.     Thor Guard has known for years of the issues regarding the Faulty Products, as is outlined in this Complaint.

18.     During the past 8 years, Thor Guard has regularly used customers, including the Federal government, as unknowing "lab rats" as it experiments with its Faulty Products. There are no reliable quality control methods and product engineering protocols used in developing or testing the Faulty Products prior to selling it to the various governmental agencies.

19.     Upon information and belief, Thor Guard sold hundreds of lightning prediction systems to Federal agencies with a total cost of $7,500 to $40,000 per system[3], in addition to ongoing maintenance, extended warranties and software licensing expenses. At the same time, Thor Guard sold the same products to other customers at a significantly reduced rate, despite contracting with the Federal government to match Thor Guard's lowest price.

## THE PARTIES

20.     Defendant Thor Guard is a Florida corporation with its principal place of business at 1193 Sawgrass Corp. Parkway, Sunrise, Florida 33323.

21.     Dugan is the President of Thor Guard, Inc. and at all times material has been aware

---

[2] The Relators have information that this discount was previously as low as 8%, until 2016.
[3] Relators do not have sufficient information to determine the exact amount of money paid by the Federal government to Thor Guard for Faulty Products, but Relators estimate the amount is in the range of $2,000,000.

of and is responsible for the fraudulent representations by Thor Guard that are raised in this Complaint.

22.     Townsend is the Chief Executive Officer of Thor Guard, Inc. and at all times material has been aware of and is responsible for the fraudulent representations by Thor Guard that are raised in this Complaint.

23.     Upon information and belief, as of this year Dugan and Townsend now own a majority of the shares of Thor Guard, after Metromedia, the majority shareholder of Thor Guard, conducted an internal investigation in response to the Jimerson Letter, as is defined below, and forced Townsend and Dugan to buy its shares.

24.     Relator Jay Gallo ("Gallo") is a resident of St. Johns County, Florida.

25.     Gallo was an employee and/or an independent contractor with Thor Guard from 2008 to 2018. He was recently fired after voicing his concerns regarding the Faulty Products and the public's safety, as is outlined in more detail below.

26.     Relator Greg Quinn ("Quinn") is a resident of Maricopa County, Arizona.

27.     Quinn is still employed with Thor Guard and is a professional meteorologist, who is in charge of National Software Sales at Thor Guard.  He has worked there since 2004.

28.     Gallo and Quinn (collectively the "Relators") bring this action on behalf of the United State of America.

## JURISDICTION AND VENUE

29.     This Court has subject-matter jurisdiction over this action pursuant to 31 U.S.C.A. §§ 3730 and 3732(a), and pursuant to 28 U.S.C.A. §§ 1331 and 1345.

30.     This Court has personal jurisdiction over the Defendants, and venue is proper, under 31 U.S.C.A. § 3732(a), which authorizes nationwide service of process and provides that an

action under the False Claims Act "may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

31.     Thor Guard transacts business in this judicial district.

## BACKGROUND

### Relators Jay Gallo and Greg Quinn

32.     Gallo signed his contract of employment on July 10, 2008.

33.     Gallo worked as an employee or independent contractor in a sales representative capacity for Thor Guard from July 10, 2008 to 2018.

34.     Gallo's employment duties included selling and servicing Thor Guard's lightning prediction systems.

35.     Prior to being terminated, Gallo raised concerns regarding Thor Guard's practices multiple times and shared his concerns regarding the Faulty Products. Finally, Gallo hired a law firm to send a letter to Thor Guard and Metromedia a/k/a Metromedia Holdings (Thor Guard's majority shareholder at the time) to further document his concerns regarding the Faulty Products and the public's safety (the "Jimerson Letter").

36.     Shortly after sending the Jimerson Letter, Gallo was terminated by Thor Guard on April 6, 2018.

37.     Gallo was fired because he spoke out regarding the Faulty Products and Thor Guard's fraudulent representations, which the government was relying on in purchasing the Faulty Products.

38.     Quinn was hired by Thor Guard in December of 2004 as a consulting meteorologist and territory sales representative for Arizona, Nevada and New Mexico. Quinn's curriculum vitae

is attached as **Exhibit B**.

39.    In November of 2012, Quinn became Thor Guard's National Software Sales Manager.

40.    Quinn is still currently working with Thor Guard as its National Software Sales Manager.

41.    Relator Gallo and Quinn have extensive knowledge of Thor Guard's practices, fraudulent representations and the Faulty Products.

42.    Relators are ready and willing to cooperate in any investigation undertaken by the United States.  Relators possess documentation and materials supporting the allegations made in this Complaint.

## Lightning Detection

43.    There are two types of lightning warning systems: (i) detection systems and (ii) prediction systems.

44.    Lightning detection means being able to know when and where a lightning strike has occurred *after* the lightning strike has happened.

45.    The United States partially funded and cooperatively developed a national lightning detection system in the 1980s called the National Lighting Detection Network ("NLDN").

46.    NLDN is the authoritative lightning detection system in the United States.

47.    Through a contract between Vaisala and the National Weather Service, Federal agencies have unrestricted and real-time access to the NLDN.

48.    Historically, the Federal government used the NLDN as its primary lightning warning system for safety purposes.

49.    Generally, the Federal government allows each Federal agency to determine a safe

distance range from detected lightning strikes in determining whether federal activities will occur or continue. For example, the Navy historically has limited its operations if a lightning strike occurs within a 10-mile radius.

## Lightning Prediction

50. Lightning prediction means being able to know when and where a lightning strike will occur *before* the lightning strike happens.

51. Since the 1990s, Thor Guard is the only company claiming its lightning warning system is a lightning prediction system, rather than a lightning detection system.

52. In other words, Thor Guard claims its systems uniquely predict lightning strikes before they occur.

53. Being able to predict lightning before it occurs is a miraculous and unique method that will help save lives and avoid business losses.

54. Falsely claiming someone can predict lightning with over 95% accuracy creates a significant and increased danger, as individuals and companies are led to believe an area is safe, even when it is not.

55. A claim by Thor Guard that its Faulty Products can predict lightning has allowed Thor Guard to separate itself from its competitors and resulted in substantial profit to its owners.

56. Thor Guard writes, "Our approach to lightning warning is completely different than any other company that produces lightning warning products. ALL other companies rely on detection and/or time of arrival (TOA) technology to determine when it is dangerous, and when it is safe, in respect to lightning in the area."

57. Thor Guard continues with, ". . . only **THOR GUARD** can <u>actually</u> tell you it is safe!" further claiming, "**THOR GUARD** systems take the guesswork out of lightning-related

decisions not only when it is time to STOP, but just as important, when it is time to RESUME an outdoor activity."

58.     Thor Guard asserts on its website, "Don't Wait on Lightning Detection, get Lightning Prediction".

59.     Federal agencies already have unrestricted access to real-time NLDN data, the most accurate lightning detection system in the United States.

60.     With respect to detection, Thor Guard claims, "Because what good does it do, telling you that lightning already occurred 2 or 20 miles away from your location AFTER it already happens!"

61.     Thor Guard claims its lightning prediction systems provide an 8 to 20-minute warning prior to a lightning strike occurring within two miles from the site.

62.     Thor Guard further claims its products work with over 95% accuracy.  See attached **Exhibit C.**

63.     The purpose of purchasing the Thor Guard systems is to obtain reliable lightning prediction on both the front end (prior to storm's arrival) and the back end (after a storm passes) of the storm.

### Thor Guard's Lightning Prediction Devices and History of Same

64.     In 1996, Thor Guard introduced its first lightning prediction system: the L100.

65.     The L100 system consisted of a computer and metal sensor.

66.     The metal sensor was open to the atmosphere.  A photograph of the metal sensor is attached as **Exhibit D.**

67.     Thor Guard has subsequently manufactured and sold several additional lightning prediction systems through 2003: L25, L50, L75, L125 and L150.

68.     Many of its models are in use, but Thor Guard is currently selling L75 and L125 models.

69.     The current products consist of four main components, which include: 1) a static electricity sensor; 2) a processor (computer); 3) the lightning prediction software; and 4) a tri-axial cable. The additional component includes a data display.

70.     The sensor's only function is to provide a voltage reading of the atmosphere.

71.     The reading of the atmosphere's voltage is transmitted by the tri-axial cable to the computer.

72.     The computer contains software that attempts to predict lightning based upon the voltage reading relayed by the sensor.

73.     The computer software allegedly uses a mathematical equation to "predict" lightning strikes.

74.     The lightning prediction system has four different warning levels:

- All Clear;
- Caution;
- Warning; and
- Red Alert.

75.     The metal sensor remained essentially the same through 2010.

76.     Thor Guard's products generally worked fairly[4] well from 1996 until 2010.

77.     From 1996 to 2010, the lightning algorithm was only changed approximately two to three times, once in October 2009 and again in August 2010.

78.     Although fairly accurate, the metal sensors required maintenance in that the

---

[4] The accuracy of the products never reached the range of 95%.

exposed metal plate had to be routinely cleaned.

79.     Thor Guard used the sales representatives to service the lightning prediction systems, including the metal sensors.

80.     In late 2010 or early 2011, according to Dugan, Weather Bug had an interest in buying Thor Guard, but did not want to have to maintain the product.

81.     Dugan explained to Quinn that switching to PVC sensors would eliminate the need for servicing the lightning prediction systems and the related expense, which would allow the sale of Thor Guard to proceed.

82.     At that time, Thor Guard began to manufacture new lightning prediction systems which used PVC (plastic) sensors, rather than metal sensors. A photograph of PVC sensors is attached as **Exhibit E.**

83.     This is when the operability of Thor Guard's products rapidly declined.

84.     In 2011, Dugan sent an internal e-mail stating that all sensors used in Thor Guard's lightning prediction systems going forward would be PVC sensors.

85.     Relators have been informed that Dugan and Townsend may have a financial interest in the third-party company that made the PVC sensors and ultimately currently makes the ASA sensors, which were purchased in bulk by Thor Guard.

86.     The PVC sensor was materially different from the metal sensor because the PVC sensor was materially smaller than the metal sensor and was encased in plastic.

87.     This dramatically affected the voltage reading accuracy of the sensor, because the sensor's plate was no longer directly exposed to the atmosphere and the smaller surface area of the sensor's plate changed the electrostatic signal of the sensor.

88.     Despite the drastic change in the sensor's design, Thor Guard continued to use the

existing lightning prediction software that was made for metal sensors.

89.      Customers, including the Federal government, and sales representatives were told by Thor Guard that the existing software would work accurately with the PVC sensor.  Upon information and belief, there was no testing or information that supported this false claim.

90.      Upon switching from the metal sensor to the PVC sensor, there were immediate substantial reports by Thor Guard clients of errors with the systems.

91.      These errors include the lightning prediction system going into "All Clear" when a lightning storm is present; a "Red Alert" when no storm is present; a "Red Alert" starting and then turning off and returning to an "All Clear" state in the middle of the same lightning storm; and failing to enter into "Red Alert" when lightning occurs within 2 miles, among other deficiencies.

92.      Finally, after massive customer and sales representatives' complaints, Thor Guard's solution was to change the lightning prediction software.

93.      As referenced above, prior to 2011, Thor Guard had made minimal changes to the lightning prediction software between 2003 and 2010.

94.      From summer of 2011 to March, 2012 Thor Guard made twenty-four (24) major revisions to the software, all while its customers, including the Federal government, unknowingly believed they were safe and relied on the false claims regarding the Faulty Products.

95.      The changes to the software did not solve the errors being generated by the PVC sensor and in fact magnified the errors.

96.      By March 2012, the Thor Guard lightning prediction systems with the PVC sensors were essentially unusable.

97.      In April of 2012, Gallo, Quinn, Dugan, Townsend, Glenn Fox (head of engineering) and other key staff attended a telephonic conference call prompted by the PVC sensor problems

and customer complaints.

98.     On the call, Townsend acknowledged Thor Guard had a "major problem" and asked what Thor Guard should do to solve the issue. Additionally, Townsend conceded the PVC sensor did not work, the lightning prediction software was flawed, and Thor Guard must go back to the metal sensor.

99.     It was decided during the April 2012 telephonic conference that Thor Guard would begin to use the metal sensors again.

100.    On May 1, 2012, Dugan sent an email to staff stating, "We are having too many issues with PVC sensors . . . "

101.    In July of 2012, Thor Guard sent a letter to some customers falsely blaming the Faulty Products' problems on the cable. A separate letter was sent to sales representatives, blaming the problems on material and software problems.

102.    Thor Guard's customers, including Federal agencies, were not informed that the lightning prediction systems had been effectively inoperable due to the PVC sensors and defective software. Instead, Thor Guard falsely advised the problems were due to a cable.

103.    An email by Thor Guard to its sales representatives acknowledges the actual problem is with the software, not the cable. This information sent to the sales representatives was not sent to customers.

104.    Some customers, including the Federal government, still today have PVC sensors and Thor Guard has not warned them of the issues or offered to replace or repair same. In addition, customers were not told about the many software revisions and some customers still today have defective software from 2012 and 2013.

105.    As the software had been modified so many times since switching to the PVC

sensor, and the pre-2011 versions could not be re-created, Thor Guard tried to find stable software to use with the newly re-installed metal sensors.

106.    During this testing, Thor Guard's customers, including the Federal government, were not informed of the material issues with the Faulty Products.

107.    At the end of August 2012, Thor Guard claimed to have found the correct software.

108.    Several meteorologists and experts employed by Thor Guard believed the Faulty Products still did not work.

109.    As expected, the problems continued, despite switching back to a metal sensor.

110.    During this time period, Thor Guard was also working on designing another enclosed sensor (the "ASA Sensor"), similar to the PVC sensor.  A picture of the ASA Sensor is attached as **Exhibit F**.

111.    Upon information and belief, Dugan and Townsend had a financial interest in the third-party company that manufactured and sold the PVC and ASA sensors to Thor Guard.

112.    Beginning in the summer of 2014, Thor Guard sold lightning prediction systems with the ASA Sensor.

113.    Similar to the release of the PVC sensor, sales representatives were told the old metal software will work with the ASA sensor.

114.    Within two to three months of selling ASA Sensors, Thor Guard began to internally insist that computers with ASA sensors use new software.

115.    Thor Guard did not inform its customers, including the Federal government, who had previously purchased these products of the need to update with new software and allowed products it knew did not work to remain in the market.

116.    Thor Guard has no reasonable way to track which of its customers have which

product or which software, so throughout the history of its products being sold, when updates or modifications need to be made, Thor Guard makes little to no attempt to notify customers who previously purchased products. Thor Guard did not put identification numbers on its PVC or ASA sensors until January, 2018.

117.   The use of the ASA sensors led to a significant increase in customer and sales representatives' complaints.

118.   Thor Guard's head of engineering, Glenn Fox, was fired in 2015 because he was of the opinion that ASA Sensors did not accurately measure the atmosphere and did not successfully predict lightning.

119.   It was determined that one of the problems was that rain and wind cause the ASA Sensors to falsely send a "Red Alert" signal. Conversely, the same heavy rains cause the system to go from "Red Alert" to "All Clear" in the middle of the storm.

120.   Subsequent to his firing, Glenn Fox was hired twice by Thor Guard on a contract basis to try to make the software less sensitive.

121.   In September, 2016, Dugan indicated to Gallo that the obvious solution was to replace all sensors installed prior to October, 2015.

122.   Thor Guard attempted to change the plate material, carbon content (percentage of carbon in ASA sensor), the size of the plate, and added a ground wire to the ASA enclosure to try and fix the problem.

123.   The problems with the Faulty Products continued.

124.   On September 2, 2011 Dugan sent an email acknowledging the problems and indicating "there are gremlins on the boards." A true and correct copy of the September 2, 2011 email is attached as **Exhibit G.**

125.    On January 30, 2012, Dugan sent an email acknowledging the issues and indicated, "we will kill someone." A true and correct copy of the January 30, 2012 email is attached as **Exhibit H.**

126.    Thor Guard regularly received complaints from customers and its own sales representatives.

127.    For example, a customer had its building hit with lightning and the Thor Guard system alerted 20 minutes later. See attached July 13, 2017 e-mail as **Exhibit I.**

128.    In 2017, in an effort to "squash" the complaints from sales representatives, as has been admitted to by Jake Swick, Thor Guard's meteorologist, an internal newsletter was issued admitting to the problems and indicating the issues have been solved, but that it will not be known for 1 or more years if the necessary steps have been taken to address the issues with the Faulty Products.

129.    The issues were not solved, and customers were again not informed of the problems. Even the claim that it may take years to confirm whether the Faulty Products are working, was not relayed to customers or interested buyers.

130.    Because of all the customer complaints, Thor Guard issued a newsletter to representatives and employees in August 2017 downplaying the issues. The newsletter attempts to convince sales representatives and employees that issues have been identified and are being resolved.

131.    Since 2011, Thor Guard has kept secret its internal knowledge of the failures of its lighting prediction products and failed to reveal that its products do not successfully predict lightning at a level to serve the purpose of the product, as is advertised. Thor Guard has also suppressed complaints by sales representatives and customers by falsely claiming new success or

blaming issues on non-existent external problems.

132.    Instead of recalling its product or informing its customers, Thor Guard continued to sell its products, while secretly attempting to make a product that worked.

133.    Upon information and belief, it will cost Thor Guard millions of dollars to recall its Faulty Products, as every single product on the market will need to be recalled and be repaired with a new sensor or software or be replaced completely.

134.    Thor Guard's competitors have become suspicious of its claim that it can predict lightning and, in an attempt to suppress these suspicions, Thor Guard issued a report indicating its competitors are misleading people. Thor Guard again confirms the Faulty Products' accuracy is greater than 95%. See report attached as **Exhibit J**.

## THE FAULTY PRODUCTS' FAILURES

135.    The Faulty Products fail in several different ways.

136.    The Faulty Products will fail to warn at all before a lightning strike occurs within 2 miles of the sensor location, contrary to what is advertised.

137.    The Faulty Products will show "All Clear", when it is not all clear and lightning strikes are occurring within 2 miles of the sensor location.

138.    Before the lightning strike, the Faulty Products may warn, but not in the advertised warning period of 8 to 20 minutes in advance of the strike. This warning window is important to customers and the public's life safety.

139.    During a storm, the Faulty Products fail to warn or show "Red Alert".

140.    After a storm or lightning strike, the Faulty Products will go in and out of "Red Alert" for lengthy periods of time when it should show "All Clear." This sometimes occurs for hours after it should read "All Clear."

141.   After a storm or lightning strike, the Faulty Products will remain in "Red Alert" for lengthy and unnecessary time periods, sometimes up to hours after it should be "All Clear."

142.   The Faulty Products will also go in to "Red Alert" when there is no storm or lightning strike in the vicinity and it is perfectly clear outside.

143.   After a storm or lightning strike, the Faulty Products will show "All Clear" before the risks are eliminated.

144.   The problems with the Faulty Products occur before and after the storm or lightning strikes.

145.   There is little to no quality control in place by Thor Guard to monitor or test the reliability of its products.

146.   An important failure that is part of the false claims made by Thor Guard is that the Faulty Products' computer indicates to customers that they can test to see whether the Faulty Products are "working".   The actual automatic daily tests merely determine whether the sensor cable is cut and/or connected at all, not whether any other portion of the system it is working.  This is another method to create a false sense of safety on the part of the customer.

147.   The "sensor test" will illustrate a passing result irrespective if the sensor works or not, and the "system test" will indicate a passing result even if the computer is weak or damaged.

148.   Dugan admits in an email knowledge of the falsity of the "sensor test", stating "the sensor test will not show any system weakness."

### Thor Guard's Knowledge of the Faulty Products' Failures

149.   Thor Guard has had internal knowledge of the failures with its Faulty Products since at least 2011.

150.   Several employees and/or contractors of Thor Guard raised concerns starting in

2011. When sales representatives started asking Glenn Fox, the Director of Engineering for Thor Guard, questions about the Faulty Products' failures. Dugan sent an email acknowledging issues with the Faulty Products and instructing representatives not to ask any more questions. A true and correct copy of the August 15, 2011 email is attached as **Exhibit K**.

151.    In addition, on May 23, 2012, Gallo sent an email to Metromedia, informing it of the issues with the Faulty Products. A true and correct copy of the email is attached as **Exhibit L**.

152.    On June 15, 2012, Gallo sent a letter to Thor Guard expressing his concerns with Thor Guard's failure to inform the Federal government of the problems with the Faulty Products. A copy of the June 2012 letter is attached as **Exhibit M**.

153.    Gallo sent an email to Dugan on July 28, 2017 with concerns about legal exposure as a result of all the complaints from customers regarding the Faulty Products failing and the dangerous conditions created by using the Faulty Products. A true and correct copy of the July, 2017 email is attached as **Exhibit N**.

154.    Since 2011, Thor Guard's internal engineers and meteorologists have regularly confirmed to management the issues with the products and their failures.

155.    Customers have regularly complained about problems with the Faulty Products. Relators only have copies of the complaints sent to them by customers or through software support emails, but several additional sales representatives for Thor Guard have reported the same in their areas. A sample of some of the complaints are attached as composite **Exhibit O**.

156.    In response to all the complaints, Thor Guard drafted a written waiver for customers to sign in order to limit its liability for future claims falsely claiming the sensors were "beta" versions, but it ultimately never used the waiver after Quinn objected. A copy of the Townsend email and draft waiver is attached as **Exhibit P**.

157.    Thor Guard is aware it has conducted virtually no testing of products, especially no reasonable or practical testing to support its claims of accuracy of the Faulty Products.

158.    Finally, on September 14, 2017, Gallo's counsel sent the Jimerson Letter to Thor Guard's majority shareholder.  Upon information and belief, a copy of the letter was provided to Townsend and Dugan in their capacity with Thor Guard.  A true and correct copy of the Jimerson Letter is attached as **Exhibit Q**.

**Townsend and Dugan's**
**Knowledge of the Products Failures and Personal Liability for Same**

159.    At all times material, Townsend and Dugan ran, managed and directed the operation of Thor Guard and at all times material have been constantly and intimately aware of the issues with the Faulty Products, as are outlined in this Complaint.

160.    Townsend and Dugan have fraudulently suppressed the issues related to the Faulty Products and through their control of Thor Guard, have allowed the Faulty Products to remain in the market, have continued to sell Faulty Products and have allowed false claims to be made to the Federal government and other customers relating to the Faulty Products, as have been outlined in this Complaint.

161.    Upon information and belief, no substantial actions have been taken by Thor Guard or its shareholders to eliminate or address the issues and risks associated with the Faulty Products.

162.    As referenced above, on September 14, 2017 Metromedia in its capacity as majority shareholder of Thor Guard, was sent the Jimerson Letter, which was shortly thereafter provided to Thor Guard.

163.    Upon information and belief, Metromedia did not take substantial actions to remedy the issues with the Product or warn Thor Guard's customers.  Metromedia's response was to recently sell the company to Townsend.

## FALSE CLAIMS

164.    The labeling of Thor Guard's products falsely claim the products are capable of predicting lightning.

165.    Every device sold by Thor Guard is labeled "lightning prediction" system.  A photograph of a lightning prediction system is attached as **Exhibit R**.

166.    Invoices sent to the Federal government state that the Faulty Products are lightning prediction systems.  Sample invoices are attached as composite **Exhibit S**.

167.    Thor Guard falsely claims these products are over 95% accurate.  It prints the following message, "THOR GUARD's lightning prediction accuracy is greater than 95%."

168.    In fact, Thor Guard tells customers, including the Federal government, lightning strikes 3 miles away should not concern them, as the Faulty Products are so accurate and will predict lightning if it occurs in the given area.

169.    Upon information and belief, no reasonable or reliable study or testing has ever been completed by Thor Guard or on Thor Guard's behalf to validate this or any other accuracy rating.

170.    As mentioned above, a random study of the Faulty Products by Relator Quinn, who is Thor Guard's current expert on these issues, shows a <u>failure</u> rate of over 80%.

171.    To be approved to sell products to the Federal government, through the GSA process, sellers must meet certain rules and regulations prior to contracting with the Federal government, which include a requirement of third party testing through the Federal Trade Commission.

172.    The products sold by Thor Guard to the Federal government do not meet the Federal government requirements for products it purchases.   For example, the Office of Federal

Coordinator for Meteorological Services and Supporting Research has established the Federal Lightning Capability Requirement (the "FLCR"). The FLCR establishes the minimum Federal interagency requirements for lightning warning systems. The Faulty Products fall short of these minimum requirements.[5]  Select pages from The Federal Lightning Capability Requirement is attached as **Exhibit T**.

173.   As another example, the L125 model has never been tested by a third party as required by Certification Products Subject to Consumer Product Safety Rules Section 102 of the Consumer Product Safety Improvement Act. Section 102 requires every manufacturer or importer of all consumer products that are subject to a consumer product safety rule to issue a certificate stating that the product complies with the applicable standard, regulation, or ban. The certificate must accompany the product and be furnished to the retailer or distributor.

174.   In addition, the Faulty Products do not comply with National Institute of Standards and Technology standards, because it is a fire code violation in that it is not grounded. The Faulty Products cannot be grounded, as it will not work.

175.   Thor Guard still falsely claims its products are in compliance with GSA requirements, as well as all federal rules and regulations.

176.   Upon information and belief, Thor Guard's contract with the Federal government requires Thor Guard to offer or match its lowest price of the products. Thor Guard falsely sells the Faulty Products to the Federal government at a much higher rate than its lowest price. On some occasions, the Federal government price is approximately double the rate Thor Guard should be charging.

---

[5] The US. Army, U.S. Navy and U.S. Air Force require 95%, 90% and 100% (accuracy) in lightning detection. The federal agencies have also set minimum thresholds for 'false positives' of lightning detection when no lightning strike had occurred. As has been detailed above, the Faulty Products are not in compliance with these minimum requirements.

177.    Attached as **Exhibit U** is a record confirming the PGA Tour receives a 50% discount on the Faulty Products.

178.    Thor Guard has provided documentation and manuals to the Federal government. Relators are not in possession of all these documents or all the GSA regulations, but believe additional false claims are being made regarding the Faulty Products.

179.    Thor Guard also makes representations on its website and in newsletters that falsely depict the Faulty Products.

180.    As described in more detail above, the Faulty Products also contain false claims and misrepresentations to customers in that there is a feature on the system to test the sensor to make sure it is working.  This test is fraudulent in that all it actually tests is whether the sensor is connected, or the cable is cut.

181.    Customers and Thor Guard representatives are not able to test the system at the site to see if it is working.  "Working" is used loosely, as even if it is working, it is not predicting lightning.  The only way to test the system is to return the sensor and computer to Thor Guard's offices, which rarely or never happens.

182.    Customers are also misled to believe a test is done every twenty-four (24) hours to confirm the Faulty Products is working.

183.    Upon information and belief, Thor Guard advertises a Bolt out of Blue ("B.O.B.") function, but it was disabled in 2012 because the high amount of false positives.

184.    Thor Guard produces a Distributor's Manual that trains its sales representatives to further the false claims regarding its Faulty Products.  The Manual also acknowledges on Page 16, its marketing strategy with respect to the government and its ability to sell through the GSA.  Page 24 references additional materials that are provided to customers, including the Federal

government, that may contain additional false claims regarding the Faulty Product. A true and correct copy of the Distributor's Manual is attached as **Exhibit V**.

**RETALIATION AGAINST RELATOR GALLO**

185.    The retaliation by Thor Guard began in May, 2012 when Gallo sent the initial correspondence to Thor Guard and Metromedia reporting his concerns. The retaliation became worse every time Gallo voiced his concerns about the Faulty Products and the public's safety.

186.    Prior to Gallo voicing his concerns, he was praised for the work he was doing. A 2012 newsletter attached as **Exhibit W** confirms Thor Guard's feelings toward Gallo before he spoke out.

187.    Recently, Gallo was also removed from distribution lists and directories, which were an important asset for sales representatives.

188.    Recently, Gallo was not allowed to attend the largest professional trade show where Thor Guard markets its Faulty Products. He had previously been required to attend this event since 2008.

189.    After Gallo's complaints, Thor Guard employees or contractors were threatened by being told they will be fired if they communicate with Gallo or if they did not provide all information about Gallo.

190.    Within a few days of receiving the Jimerson Letter, Dugan told a Thor Guard employee that Gallo and anyone on his side will be fired and that Gallo will be financially drained through legal efforts.

191.    Within a few weeks of receiving the Jimerson Letter, Dugan sent a companywide email requesting negative information on Gallo. Dugan threatened Quinn by indicating he will be fired if he does not cooperate.

192.     At some point, Gallo indicated he would not continue to sell the Faulty Products or further Thor Guard's misrepresentations to current customers by reporting to sites and telling clients he had "fixed" the problems, as the problems could not be fixed.

193.     After his complaints in 2017 and prior to being terminated, Gallo was cut off from communication, client referrals, and opportunities to earn a living.

194.     After the Jimerson Letter, Dugan blames Gallo for improper installations, as Dugan had admitted to other employees was part of his strategy.

195.     After receiving multiple complaints by Gallo regarding his concerns with the Faulty Products and its potential impact on the community, including the Jimerson Letter, Gallo received notification that he was being fired.

196.     Gallo's termination occurred on April 6, 2018.

## NOTICE TO THE UNITED STATES

As required under the False Claims Act, 31 U.S.C.A. § 3730(b)(2), Relators, simultaneous with the filing of this Complaint in camera and under seal, have provided a copy of the Complaint and written disclosure of substantially all material evidence and information the Relator possesses. Relators seek the maximum amount allowed under the False Claims Act.

## COUNT I
## VIOLATION OF 31 U.S.C.A. § 3729(a) BY ALL DEFENDANTS

197.    Relators incorporates allegations 1 through 184 by reference as if fully set forth herein.

198.    In order to acquire Federal funds, the Defendants submitted, or caused to be submitted, claims and statements which they knew were false. Specifically, Defendants submitted false claims as referenced in Paragraphs 164 through 184.

199.    Defendants made these misrepresentations knowingly and with the specific intent to induce the Federal government to reimburse Defendants for false claims. Alternatively, they made these misrepresentations with actual knowledge of their falsity, in deliberate ignorance of the truth or falsity of the information, or in reckless disregard of the truth or falsity of the information.

200.    The subject matter of Defendants' false statements was material and a direct cause of the Federal government's decision to make these payments.

201.    All of these misrepresentations and false certifications misled the Federal government and induced it into paying millions of dollars in federal funds. These funds would not have been paid had the truth been known. As a result, the United States has sustained millions of dollars in damages, in an amount to be determined at trial.

202.    Relators believe that these practices are widespread at Thor Guard, and that additional investigation will reveal additional improprieties.

203.    At all times material, Townsend and Dugan were owners, officers and/or high-level managerial employees who exercised control over Thor Guard and its fraudulent activities outlined in this Complaint.

204.    Townsend and Dugan negligently, recklessly or intentionally instructed, allowed,

controlled and directed the fraudulent activities outlined in this Complaint.

205.   By virtue of Townsend and Dugan's control and direction of the wrongful acts of Thor Guard and refusal to act to remedy the issues with the Faulty Products, they are liable for the subject damages.

206.   Relators have direct and independent knowledge of the facts underlying this Complaint, and the facts and allegations underlying this Complaint have not been publicly disclosed as defined under the False Claims Act. 31 U.S.C.A. § 3730(e).

WHEREFORE, Relators demand judgment against Defendants in the amount of three times the amount paid by the United States to Thor Guard pursuant to its false claims for payments, for a civil penalty against Defendants for each violation of the False Claims Act, for court costs, expenses, and attorneys' fees, and for such other and further relief as the Court deems just and proper.

## COUNT II
## RETALATION CLAIM BY RELATOR GALLO AGAINST ALL DEFENDANTS

207.   Relator Gallo realleges and incorporates by reference Paragraphs 1 through 196 as if fully set forth herein.

208.   In retaliation of Gallo speaking out and reporting the many violations of the Federal False Claims Act and the issues with the Faulty Products and corresponding dangers to customers and the community, Gallo was prevented from earning a living at Thor Guard and was finally terminated on April 6, 2018.

209.   As a direct and proximate result of his wrongful and retaliatory limitations on his employment and ultimate termination, Gallo suffered damages as described above.

WHEREFORE, Relator Gallo demands judgment against Defendants for the maximum amount allowed to the qui tam Relator's claim under 31 U.S.C.A. § 3730(d) of the False Claims

Act, for court costs, expenses, and attorneys' fees, and for such other and further relief as the

Court deems just and proper.

## JURY DEMAND

Relators request trial by jury on all claims so triable.


**WOOLSEY MORCOM PLLC**

By: */s/ Joshua A. Woolsey*
    JOSHUA WOOLSEY, ESQ.
    NICHOLAS W. MORCOM, ESQ.
    Florida Bar No. 037905
    Florida Bar No. 0013767
    203 Fort Wade Road, Suite 105
    Ponte Vedra, FL 32081
    (904) 638-4235 (telephone)
    (904) 638-9302 (facsimile)
    Primary: nick@woolseymorcom.com
    Secondary: josh@woolseymorcom.com
    sara@woolseymorcom.com
    ariel@woolseymorcom.com

    *Attorneys for RELATORS*